817 So.2d 866 (2002)
SONEET R. KAPILA, P.A., d/b/a Kapila & Company, Appellant,
v.
GIUSEPPE AMERICA, INC., Appellee.
Nos. 4D01-2102, 4D01-2664, 4D01-3246.
District Court of Appeal of Florida, Fourth District.
April 17, 2002.
Rehearing Denied June 12, 2002.
Lisa M. Schiller and Mark S. Roher of Rice, Robinson & Schiller, P.A., Miami, for appellant.
John D. Kelner of Law Office of John D. Kelner, Hollywood, for appellee.
POLEN, C.J.
Plaintiff/Appellant Kapila & Company raises four issues on this appeal of a jury verdict awarding $44,665.79 in damages on Appellee Giuseppe America, Inc.'s cross-claim, and the trial court's cost award in favor of Giuseppe following the judgment. Giuseppe raises two issues on cross-appeal in connection with the jury verdict awarding Kapila $10,775.64 on its original claim, both of which we find without merit. We write solely to address one claim raised by Kapila, summarily affirming as to all its other claims without further discussion.
The facts giving rise to the instant appeal are somewhat unique, and as such, dictate a somewhat unique outcome. Appellee *867 Giuseppe is a rather large distributor of internationally produced jewelry. Giuseppe had suffered an alleged breach of contract by one of its buyers, Jan Bell. Giuseppe filed a breach of contract claim, and in pursuit of such claim hired David Lawrence to act as its accounting expert, to calculate the damages Giuseppe had suffered as a result of Jan Bell's breach. Litigation followed its "natural" course and the case was set for trial. Then, an unfortunate and unforseen event befell Giuseppe. At Lawrence's deposition, merely weeks before the trial date, Mr. Lawrence made a most startling admission-he had lied on his curriculum vitae ("CV"), claiming he had graduated from law school when he had actually only completed two years. Giuseppe's counsel realized they could not proceed to trial with Lawrence as their expert witness, and moved the court for permission, on an emergency basis, to change their expert witness. The court gave Giuseppe permission to replace its expert; Giuseppe was referred to forensic accountant Soneet R. Kapila, P.A., d/b/a/ Kapila & Company.
Kapila and Giuseppe entered into a contractual relationship, via a retainer agreement letter, signed February 3, 1999. The agreement set out Kapila's hourly rates, and provided the parties would define the tasks to be performed in more detail at a later date. The agreement also provided, "We [Kapila] reserve the right to stop work on clients where an amount is past due. In the event that we are requested to furnish judicial testimony, it is our practice to have all outstanding bills paid in full prior to the commencement of such testimony."
Kapila sent Giuseppe its first invoice February 22, for the amount of $13,385. Giuseppe paid this bill without objection. A second invoice was sent on March 2, for the amount of $8,533. This bill was also paid without objection. Then, on April 8, Kapila sent out its third invoice, the infamous "April bill." This invoice requested payment of $45,679. In the words of Giuseppe's agents they were "freaked out," especially since their previous accounting expert [Lawrence] had done for all intents and purposes the same assignment for a grand total of approximately $29,000. Giuseppe's counsel set up a meeting to discuss the April bill with Mr. Kapila. At their lunch meeting, Mr. Kapila imparted all the work was necessary and he refused to deduct any of the charges. The bill was not paid in full, until Kapila sent Giuseppe a letter June 1, which stated he had been subpoenaed by opposing counsel, and that if all outstanding invoices were not paid by June 3, he would withdraw from the subject representation. The bill was then paid. One more invoice followed in June for $20,121, which was paid before the Jan Bell case went to trial.
Kapila testified for Giuseppe in the Jan Bell trial, and a considerable verdict was returned in Giuseppe's favor.[1] After trial, Kapila sent a final bill in the amount of $14,335. A portion of the bill was paid, but it was never paid in full. Kapila subsequently instituted suit seeking payment of the balance of the final bill, approximately $10,835.
Giuseppe counterclaimed that it was not responsible for the outstanding bill on the grounds Kapila had obtained past monies from Giuseppe by imposition, i.e., past payments were made due to "duress." Giuseppe also sought repayment of past payments made in excess of $50,000, on the grounds said sums had been paid as the *868 result of such duress. Kapila was ultimately awarded $10,775.64 in damages for its unpaid post-trial bill; Giuseppe was awarded $44,665.79 as damages sustained as a result of Kapila obtaining money under duress from Giuseppe.
Kapila contends Giuseppe should have been barred from obtaining repayment of any sums paid, since Kapila had contractually reserved the right to stop work where any sums were past due, and hence there was no impropriety in "threatening" to stop work in such a situation, and any "threat" to do so could not amount to duress as a matter of law. We disagree. Duress is that degree of constraint or danger either actually inflicted or threatened and impending, sufficient to overcome the mind and will of a person of ordinary firmness. Pac. Mut. Life Ins. Co. v. McCaskill, 126 Fla. 82, 170 So. 579, 583 (1936); City of Miami v. Kory, 394 So.2d 494 (Fla. 3d DCA 1981). To constitute the coercion or duress sufficient to make a payment involuntary, there must be some actual or threatened exercise of power possessed, or believed to be possessed, by the party exacting or receiving the payment over the person or property of another, for which the latter has no means of immediate relief other than making the payment. Pac. Mut., 170 So. at 583(emphasis added); see also Spillers v. Five Points Guaranty Bank, 335 So.2d 851, 853 (Fla. 1st DCA 1976). The concept of duress is well-grounded in the law, and we see no reason why duress cannot lie on the instant facts.
We do not address whether or not a general cause of action for "overpayment" via business compulsion exists in Florida law.[2] We expressly do not address other instances of contractual relationships, and payments made thereunder, between relatively sophisticated parties, and solely address the unique facts of the instant case. Accordingly, we wish to emphasize that the claims made by Giuseppe are unique to the instant factual scenario, and this opinion is not intended to have broader application to other disputes between contracting parties. Here, the evidence clearly established that Kapila was fully aware of Giuseppe's rather dire situation, where a large sum of monies was sought in the underlying [Jan Bell] litigation, significant litigation sums had surely already been incurred, and Giuseppe was for all intents and purposes "stuck" with Kapila as its (only) damages expert. This was further reinforced by the testimony by Giuseppe's agents, and its counsel, who had acted as the intermediary between the parties. That testimony was that Giuseppe would have been unable to seek judicial relief replacing Kapila by the time the April bill came due, nor to obtain a continuance of the August trial date with Jan Bell to attempt to do so; ergo, the bill was eventually paid only due to the extremely exigent circumstances.
Contrary to Kapila & Co.'s assertion, it did not have an absolute and unfettered right to demand any payment it saw fit, without reference whatsoever to good faith, which is an implicit element of all *869 contractual relationships. Under Kapila's theory, it could have demanded any sum imaginable on the eve of trial, demanding immediate payment, threatening to stop work if such payment was not made, and such threat could never constitute duress as a matter of law, since the right to stop work where payments were past due had been contractually reserved. Had Kapila's April bill been for a patently bad faith amount such as one million dollars, and had payment been rendered in light of a threat to stop work, such threat made with full knowledge of Giuseppe's dire reliance on Kapila's testimony, there would seem to be no question a claim for monies paid under duress could lie. We hold where the sum sought was "only" $45,679[3], the outcome dictated by the law is no different.
We note the jury was properly instructed on the law of duress, as laid out Pacific Mutual, supra.[4] We find no error in the jury's verdict finding a sum of $44,665.79 had been obtained by Kapila from Giuseppe under duress, such finding supported by competent and substantial record evidence. We note we have found no specific cases in Florida directly addressing a claim for "business duress" on similar facts; on the other hand, we have found no cases that prohibit such a claim. As discussed above, we find Giuseppe could recover monies paid under duress on the unique facts of this case.
Additionally, we find the aforementioned verdict is in no way inconsistent with the jury's finding that Giuseppe owed Kapila $10,775.64 for the unpaid balance of the post-trial bill. We are unpersuaded by the additional points raised by both parties. As such, the three judgments (verdict, two cost judgments in favor of Giuseppe) entered by the lower court which form the basis of this appeal are affirmed.
AFFIRMED.
STONE and GROSS, JJ., concur.
NOTES
[1] The amount of the verdict was not admitted into evidence at the trial which forms the basis of this appeal. Kapila contends this ruling by the trial court constituted an abuse of discretion; we disagree, and abide by the trial court's ruling in our instant opinion.
[2] See generally 25 Am.Jur. 2D Duress and Undue Influence 6 (1996)(noting as a general rule, the payment of money or the making of a contract may be under such circumstances of business necessity or compulsion as will render the same involuntary and entitle the party so coerced to recover the money paid; recognizing some courts recognize economic duress only as a defense, while other courts recognize economic duress as a cause of action under a tort theory, i.e., the duty is deemed to be the reasonable use of the superior economic power of the defendant, the breach is using such power unlawfully or unreasonably, and proximate cause is shown by the fact that the victim had no reasonable recourse but to acquiesce in the unlawful conduct of the defendant, causing damage).
[3] Or "only" $102,053, if all of Kapila's bills were considered.
[4] The jury was charged as follows:

"[T]he issues for your determination on the claim of Giuseppe America against Kapila & Company are whether Kapila & Company obtained money from Giuseppe America by imposition or duress.
Imposition or duress is that degree of constraint of danger, actually inflicted or threatened and impending, that is sufficient to overcome the mind and will of a person of ordinary firmness. To constitute such duress or coercion as will render a payment involuntary, there must be some actual or some threatened exercise of power possessed, or believed to be possessed by the party exacting or receiving the payment over the person or property of another for which the latter has no other means of immediate relief than that of making the payment.
Where a party makes a payment of any sum under a claim of right with knowledge of the facts, such a payment is voluntary and cannot be recovered.
The mere fact that an overpayment of some sort has been demanded and payment made will not support the claim of imposition or duress. The claim requires that Giuseppe prove that the payment was made under duress.
. . .
[I]f you find for Giuseppe America, you should award Giuseppe America an amount of money that the greater weight of the evidence shows will fairly and adequately compensate Giuseppe America for such loss of damage as was caused by the imposition or duress. Such imposition or duress is the case of loss or damage if it directly, and in a natural, continuous sequence produces or contributes substantially to producing such loss or damage."